# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **MICHELLE ANN BARRY,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **Case No. CIV 13-040-RAW-KEW** |
| | ) | |
| **DEBBIE ALDRIDGE, Warden,** | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

This matter is before the court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, a pro se inmate currently incarcerated at Mabel Bassett Correctional Center in McLoud, Oklahoma, attacks her conviction in Latimer County District Court Case No. CF-2003-093 for First Degree Murder. She sets forth the following grounds for relief:

I.  Admission of hearsay evidence.

II.  Trial was infected with improper and inadmissible opinion testimony which invaded the province of the jury, resulting in denial of a fair trial and due process of law.

III.  Improper admission of bad character evidence which violated right to due process and a fair trial.

IV.  Abuse of discretion by the trial court in admitting gruesome and inflammatory autopsy photographs.

V.  Petitioner was deprived of the effective assistance of counsel.

VI.  Accumulation of error in this case deprived the petitioner of due process of law.

The respondent concedes that Petitioner has exhausted her state court remedies for the purpose of federal habeas corpus review. The following records have been submitted to the court for consideration in this matter:

A.    Petitioner's direct appeal brief.

B.    The State's brief in Petitioner's direct appeal.

C.    Summary Opinion affirming Petitioner's Judgment. *Barry v. State*, No. F-2009-1120 (Okla. Crim. App. Jan 25, 2012).

D.    State court record.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Facts**

The Oklahoma Court of Criminal Appeals (OCCA) set forth the facts of this case in its Opinion affirming Petitioner's Judgment:

At approximately 4:00 a.m. on August 17, 2003, Mary Gideon and her husband were awakened by knocking on the front door of their home in Wilburton, Oklahoma. They opened their door to Appellant standing on their front porch yelling, "Help me! Help me!" Mr. Gideon called 911 while Mrs. Gideon followed Appellant to the house next door where Appellant and her

two children, five-year-old A.H. and seven-month-old Andrea, lived with Appellant's parents. Appellant's mother, father, and A.H. were standing on the front porch when they arrived. Mrs. Gideon went inside with Appellant where she saw the baby, Andrea, on the couch in the living room. The child was naked and motionless with bruises on her head and body. Her body was cool to the touch, her eyes were fixed, and she was not breathing and appeared to have no pulse.

The police and EMTs responded to the 911 call, and Andrea was taken to the hospital by ambulance where she was pronounced dead upon arrival. The doctor who saw her in the emergency room believed that she had been dead for an hour.

Appellant spoke with Latimer County Deputy Sheriff Robert Bias at the hospital. He asked her what happened to the baby and she told him that her five-year-old son, A.H., hit the baby in the head. Later that day Appellant waived her Miranda rights and spoke with John Hobbs, Director of Law Enforcement for the Choctaw Nation. During the interview, Appellant told Hobbs that she gave Andrea a bottle and put her to bed at 11:00 p.m. on August 16, 2003. She stated that she woke and found Andrea unresponsive in the hallway just outside the bedroom door. When asked what she thought had happened, Appellant responded, "I think A.H. hit her in the head with a board. I woke up and found A.H. standing in the hallway next to Andrea and there was a board lying on the floor next to her." Toward the end of the interview, Appellant told Bias that if she did kill the baby she didn't remember doing it.

At trial, Appellant's mother, Elizabeth Barry, testified that on August 16, 2003, Appellant left the house at 4:30 p.m. and came home around 10:30 p.m. During the time that Appellant was gone, Mrs. Barry watched the children. After Appellant came home, she took the children into her room to go to bed at around 11:00 p.m. Mrs. Barry and her husband also went to bed at this time. At 11:30 p.m., Mrs. Barry's other daughter, Angela, came to the house and told Mrs. Barry that her car had broken down not very far away. Mrs. Barry drove Angela back to her car and then drove to a Handy Stop where she called Don Kilpatrick to come help Angela. Around midnight, Mrs. Barry went back home. She looked into Appellant's room where she saw Appellant and A.H. asleep in the bed and she heard Andrea cooing in her bassinet. Mrs. Barry went back to bed.

Mrs. Barry testified that sometime during the night, she heard water

running and she got up to investigate the source. She went out into the hall where she saw Robert Heath coming out of the bedroom.[1] Heath acted surprised to see her and said, "Oh, Beth." He told her, "Well, I just came by to clean up." He had two girls with him and he introduced them to Mrs. Barry. One of the girls, Christa Jones, came from the living room and got A.H. and took him by the hand down the hall. Heath told Mrs. Barry that the girls were going to help Appellant so that she could get some rest. Although Mrs. Barry thought this was strange, she was sleepy so she just went back to bed. When questioned at trial, Mrs. Barry admitted that she did not mention seeing Heath or the two girls with him in the statement she made to the police shortly after the event nor did she mention it in any of her testimony at prior proceedings. This was the first time Mrs. Barry had told anyone that she saw Heath and the two girls in the house on the night that Andrea was killed.

Don Kilpatrick testified that on August 16, 2003, he lived with Appellant's sister, Angela. He testified that on this date, Mrs. Barry called him and told him that Angela's car was broken down a short distance from the Barry's house. Kilpatrick went to where Angela's car was broken down to check it out. While he was working on the car, a white car drove by slowly, turned its lights out, and parked around the curve near the Barry house. Kilpatrick heard a car door shut. A short time later, the car drove back by and it was occupied by only one person. Kilpatrick continued to work on Angela's car. When he finished, at around 1:00 or 1:30 a.m., he saw Robert Heath walking away from him toward the Barry's house.

Mrs. Barry's and Kilpatrick's testimony that Robert Heath was seen in and near the Barry house on the night that Andrea was killed was not undisputed. Robert Heath testified at trial that on the afternoon and evening of August 16, 2003, he was at Jose Vanzuela's house drinking beer. At or about 3:00 in the afternoon, Appellant came over to Vanzuela's house where she and Heath argued about money. While they were arguing, Heath thought he saw the police coming and he took off running toward the back of the apartments, because he did not want to be arrested on an outstanding warrant. As he ran around the apartments at full speed, he hit a window air conditioner with his head. When he walked back around to the front, Heath had blood running down his face and a large injury to his forehead. Appellant and Vanzuela told Heath to go get help and when he refused Vanzuela asked both

---

[1] Robert Heath was A.H.'s and Andrea's father. He had lived in the Barry home before when he was dating Appellant but was not living there in August of 2003.

Appellant and Heath to leave. Appellant and Vanzuela parted ways, and Heath walked to a trailer park where some girls he knew were staying. The girls called an ambulance, and Heath was taken to the hospital. After Heath's head was treated, he was arrested for public intoxication on the outstanding warrant, and he was placed in the drunk tank in the Latimer County Jail until the next day when he was taken to the Choctaw Tribal Building and told that his daughter, Andrea, had been killed during the night.

Heath's testimony was corroborated by several witnesses at trial. Vanzuela testified that Heath and Appellant were at his house arguing on August 16, 2003, and after Heath split his head open, he asked them both to leave. Wilburton Police Officer Jesse James testified that on August 16, 2003, he was dispatched to a medical emergency at a trailer park. When he arrived, he saw that the injured person was Heath. Because Officer James knew that Heath had an outstanding warrant, he followed the ambulance to the hospital. After Heath had been treated and released, James took Heath into custody and booked him into the Latimer County Jail. Heath was stumbling drunk when James booked him into the jail, and James watched as Heath was put into the drunk tank. James saw Heath again the following day at 3:00 p.m. when he went to the jail to get Heath to take him to the Choctaw Tribal Building. Officer James testified that Heath looked the same when he got him out of the jail on August 17 as he did when he was booked into jail on August 16. Tim Baker, who was the Wilburton Police Chief in August 2003, testified that he was with Officer James when Heath was arrested and booked into the Latimer County Jail at around 11:30 p.m. on August 16, 2003. To his knowledge, Heath was in the Latimer County Jail from 11:30 p.m. on August 16, 2003, until he was taken to be interviewed at about 3:00 p.m. the next day.

*Barry v. State*, No. F-2009-1120, slip op. at 1-6 (Okla. Crim. App. Jan. 25, 2012) (footnote renumbered).

The OCCA's factual findings are entitled to a presumption of correctness, unless Petitioner produces clear and convincing evidence to rebut the presumption. 28 U.S.C. § 2254(e)(1).

**Ground I: Admissibility of Hearsay Testimony**

Petitioner alleges in Ground I that Robert Heath killed their daughter Andrea. In

support of this theory, the defense attempted to call Janet Clark as a witness. Ms. Clark was prepared to testify that two frantic young women came to her house in the early morning hours of August 17, 2003, and claimed they had been at Petitioner's house where they witnessed Robert Heath throw his baby against the wall. The State objected to Ms. Clark's testimony, arguing it was inadmissible hearsay. The defense asserted that these eyewitness statements were admissible as excited utterances or the present sense exceptions to the hearsay rule. The prosecutor, however, alleged there was no indicia of reliability with the statements, because they did not come to light until 2007, allowing time and motive to fabricate. The trial court excluded the proffered testimony, finding the statements made by the witnesses to Janet Clark were not admissible as excited utterances, because "there was quite a time lapse between the incident and the story," and the girls would have had "ample time to fabricate a story" prior to arriving at Ms. Clark's home. The trial court did not allow the defense to present the hearsay evidence. *See* Petition at 21.

The OCCA denied relief on this claim:

> . . . Janet Clark was interviewed twice, once on August 6, 2007, and once on December 11, 2007. The substance of these interviews was written in memorandums and provided to the trial court, as an offer of proof of what Clark would say if allowed to testify about the hearsay statements made to her by Christa Jones and Karen Spain-McComb. Clark told the interviewer that on August 17, 2003, at about 2:30 a.m., Christa Jones and Karen Spain-McComb woke her up by banging on her door. The girls were crying, distraught, and otherwise visibly shaken. Clark said that they told her they had been at Appellant's house babysitting so Appellant could get some rest. They were sitting in the living room watching TV with A.H. when Robert Heath came to the home and banged on the door sometime after midnight. Heath, who told them he was there to get his stuff, was angry and loud and although he broke dishes and trashed the house, no one woke up. Jones and Spain-McComb told Clark that Heath went into Appellant's room and when Andrea woke and began to cry, Heath reached into the baby's bed, took the baby by

and arm and a leg and threw her against the wall. Jones and Spain-McComb ran out of the house. The girls told Clark that they did not go to the police because they were afraid of Heath. Instead, they ran to Jose Valenzuela's apartment but they were unable to wake anyone. Next they ran east to a house where Spain-McComb's grandmother lived. When they were unable to awaken anyone at this house, they hid for a while behind a bus parked at the house because they were afraid Heath was following them. After hiding behind the bus they walked a distance to Clark's home where they told her what had happened.

After listening to argument and reading the memorandums of interviews, the district court found the statements made to Clark by Jones and Spain-McComb were not spontaneous enough to fall within either the excited utterance exception or the present sense impression to the hearsay rule as there was more than ample time between the startling event and their conversation with Clark for the girls to fabricate a story.[2] The record supports the trial court's finding that there was time between the startling event and the hearsay statements relating to it for reflection and fabrication. The statements were not a continuing transaction with the event and were not made under circumstances excluding the possibility of premeditation and fabrication. Nor were the statements made so contemporaneously with the event to negate "the likelihood of deliberate and conscious misrepresentation." *Hancock v. State*, 155 P.3d 796, 813 (Okla. Crim. App. 2007). Under the record before this Court, we do not find that the trial court abused its discretion in so ruling. This evidentiary ruling did not deny Appellant her constitutional right to present a complete defense.

*Barry*, No. F-2009-1120, slip op. at 8-10 (Okla. Crim. App. Jan. 25, 2012) (footnote

---

[2] The August 6, 2007, memorandum of interview noted that Clark advised that sometime after this incident, Crista [sic] Jones was killed in a car accident and Karen Spain-McComb was incarcerated. The availability of the declarant is immaterial to the admissibility of a hearsay statement under either 12 O.S. 2001, § 2803(1) or (2), and there is no indication that the trial court improperly considered this information in ruling upon the hearsay issue. However, after ruling that these statements were not admissible under either exception to the hearsay rule, the district court did advise defense counsel that he was willing to recess the proceedings so that counsel could have Spain-McComb transported to testify at trial. Defense counsel declined this offer, presumably because, as the State noted on record, Spain-McComb was located and contacted in prison and denied making the statements which are the subject of the hearsay at issue.

renumbered).

The respondent alleges this claim is a matter of state law that is not subject to federal habeas corpus review. A criminal defendant has the right under the Sixth Amendment to "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). The right to present a defense does not, however, prohibit judges from excluding evidence under well-established rules of evidence. *Id*. at 326.

A habeas petitioner is only entitled to habeas relief for an improper state evidentiary ruling," if the alleged error was so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Regilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002) (internal citations omitted). Here, the court finds Petitioner has not met that standard, and she was not denied her right to a complete defense.

The court further finds the district court was correct in its ruling that the statements did not meet the requirements for either the excited utterance or present sense exception to the hearsay rule. Furthermore, Petitioner has not shown how she was prejudiced by the exclusion of Janet Clark's testimony, when Karen McComb was located during the trial, and she denied Ms. Clark's story. If the trial court had allowed Ms. Clark to testify about what Ms. McComb allegedly told her on the night of the murder, it would have been rebutted by the prosecutor's calling Ms. McComb as a witness.

The OCCA's decision on this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Furthermore, this decision did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2).

8

This ground for habeas relief fails.

**Ground II:  Improper Opinion Testimony**

Petitioner alleges in Ground II that the trial court abused its discretion by allowing the expert opinion of Officer John Hobbs regarding the interview techniques he used to interview Petitioner.  She also claims Dr. Rita Chandler had no special qualifications to testify about the incapability of A.H., Petitioner's five-year-old autistic son, to commit the murder.

Hobbs testified about his interrogation of Petitioner on August 17, 2003.  He claimed to have specialized training in interview and interrogation techniques and explained he used a two-stage technique when questioning suspects.  The first stage was an initial interview with basic questions to "get a feel for whether a person is going to be deceptive or not." Hobbs said he watches the suspect to determine whether he can observe anything he might "consider to be nervous energy that they are burning off due to the fact they are nervous because they know that they are lying at that point, such as bouncing a foot or twirling their hair or different items like that."  This initial interview is followed by the interrogation portion which is more accusatory.  During the interrogation process, he focuses on areas in which he senses deception by the subject.  Hobbs testified that during the initial interview stage, Petitioner was very unemotional and appeared to be slightly angry and frustrated. Hobbs thought Petitioner was not honest about how Andrea was killed and whether A.H. may have killed her.

On cross-examination, the defense attempted to mitigate the damage by questioning Hobbs about his ability to determine if a witness was being deceptive.  Counsel asked him if he was "some kind of a human lie detector," and he responded, "No."  Petitioner asserts Hobbs' opinions were highly prejudicial and inadmissible speculation.

Petitioner also complains that Dr. Chandler gave certain expert testimony, but she has no special skill or knowledge in the areas of forensic pathology, pediatrics, or biometric engineering. In addition, Dr. Chandler stated no factual, documented, or tested basis for her opinion that A.H. would not have been capable of inflicting Andrea's skull fractures.

The OCCA discussed and denied relief as follows:

> . . . The record reflects that on direct examination, Hobbs initially testified about his specialized training in interview and interrogation techniques. He testified that he was trained to look for indicators that someone was being deceptive and that during his interview with Appellant, he noticed several such indicators. Hobbs found it significant that during the interview Appellant failed to make eye contact with him when he asked what had happened to Andrea and that she burned off nervous energy by playing with a small hole in her jeans. He also noted that Appellant was unemotional, angry, and frustrated during the interview. Hobbs testified that he used these cues to ask Appellant pointed questions during the interrogation that followed the interview. Appellant argues that Hobbs in effect gave personal opinions characterizing her honesty and credibility based upon sheer speculation.

> Title 12 O.S. 2001, § 2702 provides that, "[i]f scientific, technical or other specialized knowledge will assist the trier of act to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." It is well settled that "police officers are [ ] capable of giving expert testimony, based upon their experience and specialized training." *Webster v. State*, 252 P.3d 259, 279 (10th Cir. 2007). *See also Andrew v. State*, 164 P.3d 176, 196 (Okla. Crim. App. 2007). A review of the record reflects that Hobbs' testimony was based on his perceptions in conjunction with his extensive training and experience. While he testified that based upon his training he believed that Appellant was being deceptive at times during the interview, his testimony explained the direction of his inquiry during the subsequent interrogation and did not invade the province of the jury. Additionally, despite Appellant's argument to the contrary, we find that this testimony, which did not purport to be scientific in nature, was not subject to the requirements of *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See Malone v. State*, 168 P.3d 217 n.153 (Okla. Crim. App. 2007). There was no plain error in the admission of this testimony and the trial court

did not abuse its discretion in allowing it to be introduced into evidence at trial.

   Appellant complains additionally that Dr. Rita Chandler also testified beyond the realm of her expertise. It was established at trial that Dr. Chandler has a PhD in Educational Psychology and provides family training in autism. She testified that she worked with A.H., who is autistic, since 2004 when she was asked to do so by the Developmental Disability Services Division of the Department of Human Services. Dr. Chandler testified that in 2004, when she first began working with A.H., he was not conversational and his spontaneous language skills were limited. She could tell by his actions that A.H.'s thinking was extremely disorganized. Dr. Chandler also testified that A.H. was small for his age. Given her assessment of A.H., Dr. Chandler opined at trial that he would not have possessed the rational thinking process or the physical strength to be able to remove his sister from her crib, take [her] to the hallway and crush her skull. Although Appellant argues to the contrary, we find the record supports the conclusion that Dr. Chandler's expert testimony was not speculative but rather, was properly based upon her perceptions of the child in conjunction with her extensive training and experience. Again, there was no plain error in the admission of this testimony and the trial court did not abuse its discretion in allowing this the same to be introduced into evidence at trial.

*Barry*, No. F-2009-1120, slip op. at 11-13.

The respondent alleges the OCCA's determination that the trial court did not err in allowing expert opinion testimony was a matter of state law that is not subject to federal habeas corpus review. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law issues. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1995) (per curium)). To the extent Petitioner is arguing that the state court erroneously interpreted and applied state law, habeas relief is not warranted. *Boyd v. Ward*, 179 F.3d 904, 916 (10th Cir. 1999). A writ of habeas corpus

cannot be issued on the basis of a perceived error of state law, "absent a determination that the state law violation rendered the trial fundamentally unfair." *Spears v. Mullin*, 343 F.3d 1215, 1245 (10th Cir. 2003) (citing *James v. Gibson*, 211F.3d 543, 545 (10th Cir. 2000) (internal citations omitted)).

The court finds Petitioner's trial was not fundamentally unfair, and this evidentiary issue is not cognizable on habeas review. Furthermore, the OCCA's determination of this claim was not contrary to, or an unreasonable application, of Supreme Court law, and the decision was not based on an unreasonable determination of the facts presented at trial. *See* 28 U.S.C. § 2254(d). This claim for habeas relief is meritless.

### Ground III: Other Crimes and Bad Character Evidence

Petitioner next claims the trial court improperly allowed introduction of evidence of other crimes or bad character evidence regarding her prescription drug usage, testimony about bugs on the victim's back, and Petitioner's lack of emotion after the murder. The respondent alleges this matter also is an issue of state law not subject to federal habeas corpus review.

The OCCA discussed this issue and denied relief as follows:

> Prior to trial defense counsel filed a motion in limine seeking to prevent the State from offering evidence of Appellant's drug usage, the condition of Appellant's home, Appellant's poor parenting abilities and her lack of emotion with regard to her children. A hearing was held on this motion. With regard to evidence of Appellant's drug usage, the trial court held that the State was precluded from introducing general evidence that Appellant was a drug user although the court noted that evidence of her drug usage immediately prior to the killing may be admissible depending on the nature of the drugs used and their effect on her temperament. The trial court also ruled that the State was precluded from offering evidence of Appellant's poor housekeeping and parenting skills and lack of emotion with regard to her children unless such evidence was shown at trial to be relevant.

Appellant argues . . . that the trial court erred in allowing the State to introduce irrelevant and prejudicial character evidence that it used to improperly suggest her guilt. Again, the trial court's decision regarding the admission of evidence is reviewed for abuse of discretion and will not be reversed absent a clear abuse of discretion. *Hancock*, 155 P.3d at 813. "A ruling on a motion in limine is advisory and not conclusive." *Cuesta-Rodriguez v. State*, 241 P.3d 214, 240 (Okla. Crim. App. 2010). . . . Appellant's failure to object to some of the evidence at issue in the motion in limine at the time it was offered waives all but plain error as to the evidence not met with contemporaneous objection.

Appellant first complains that the trial court's ruling on the motion in limine was violated when John Hobbs testified that during his interview with Appellant he asked her if she used drugs and she told him that she used prescription pills sometimes. Defense counsel objected to this testimony and the trial court sustained the objection. Hobbs testified that he had inquired about Appellant's drug usage because of the number of times that she had indicated she did not remember in response to questions he asked her. The single reference to Appellant's drug use indicated only occasional drug use and, as explained by Hobbs, was relevant as a possible explanation of why Appellant could not respond to the questions he asked her. This evidence was relevant for the reason explained by Hobbs and its probative value was not substantially outweighed by its potentially prejudicial effect. 12 O.S. 2001, § 2403.

Next Appellant complaints that the trial court's ruling on the motion in limine was violated when State's witness Mary Gideon testified that when she saw Andrea there were bugs on the child. This testimony was met with objection and the objection was sustained. When a trial court sustains an objection, the error is usually cured. *See McElmurry v. State*, 60 P.3d 4, 30 (Okla. Crim. App. 2002). Although Mrs. Gideon mentioned bugs twice, she was not allowed to go into detail about the bugs or what she saw. The trial court's ruling cutting off Gideon's testimony was sufficient to cure any error.

Finally, Appellant complains that the trial court's ruling on the motion in limine was violated when State's witness Hobbs testified about Appellant's lack of emotion after the death of her child and her lack of remorse. Appellant notes that defense counsel did not object to this testimony at trial and accordingly all but plain error has been waived. We do not find that this evidence rose to the level of plain error. This argument does not require relief.

*Barry*, No F-2009-1120, slip op. at 13-15.

The respondent alleges the determination of this claim by the OCCA was not error, and the claim was a matter of state law that is not subject to federal habeas corpus review. As noted above, state court evidentiary rulings are based on questions of state law and "may not provide habeas corpus relief . . . unless [those rulings] rendered the trial so fundamentally unfair that a denial of constitutional rights results." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotations omitted); *see also Smallwood v. Gibson*, 191 F.3d 1257, 1277 (10th Cir. 1999) (applying the same standard to review a state court's decision to admit evidence of prior bad acts). Thus, to the extent Petitioner's claim in Ground III relies solely on state law, she fails to state a cognizable claim for habeas relief. Moreover, as set forth below, the court finds that the admission of the challenged prior bad acts did not render Petitioner's trial fundamentally unfair.

Regarding Chief Hobbs' testimony about Petitioner's admission to using prescription drugs, the evidence was relevant to find why, in response to many of Hobbs' questions, she could not remember what happened the night of the murder. The testimony was relevant to help determine if Petitioner's perception and memory of the events in question was influenced by drug use. Trial counsel objected to the question, however, and the court sustained the objection, thereby curing any error. (Tr. II 377-78). The court finds Petitioner has failed to show she was denied a fundamentally fair trial by the remaining unobjected-to testimony concerning her memory loss and the potential cause of the memory loss.

With respect to Mrs. Gideon's description of the baby's body when she was summoned to the house, she described creases on the baby's back, discoloration of her skin, and bugs on her back. (Tr. II 223-24). Defense counsel immediately objected, the objection

was sustained, and any error was cured under Oklahoma law. *See Slaughter v. State*, 950 P.2d 839, 869 (Okla. Crim. App. 1995).

Even if there had been no objection, Mrs. Gideon's testimony was not a comment on Petitioner's residence or evidence of Petitioner's bad character., and it did not rise to the level of rendering the trial fundamentally unfair. Instead, it was a single description of the baby's body as Mrs. Gideon found it. The testimony was brief, and the prosecutor immediately shifted the witness's attention to the creases she observed on the baby's back. (Tr. II 224).

Finally, Petitioner complains that testimony by Chief Baker and Chief Hobbs about her lack of emotion after her baby's murder was improper bad character evidence. Chief Baker testified that he saw Petitioner sitting in a patrol car at the hospital where the baby was taken, and she was emotionless and staring forward. He further testified that she was not under arrest and was free to go inside the hospital to check on her baby, but chose instead to remain in the police car. (Tr. II 321-22). Chief Hobbs testified that Petitioner was very unemotional during his interview with her shortly after the murder, but at times she appeared angry. (Tr. II 379). Petitioner did not object to the testimony at trial, thereby waiving all but plain error under Oklahoma law. The OCCA found the testimony did not rise to the level of plain error. *Barry*, No. F-2009-1120, slip op. at 15.

The respondent asserts the testimony about Petitioner's lack of emotion was not improper character evidence, but rather evidence of consciousness of guilty by conduct. The court finds Petitioner's demeanor shortly after the murder was a proper subject for comment by the police officers who had participated in numerous crime investigations. It was not improper to show Petitioner's lack of emotion when her baby had just been murdered.

15

Furthermore, under Oklahoma law, police officers are allowed to give opinion testimony about a defendant's lack of emotion, based on their training and experience. *See Andrew v. State*, 164 P.3d 176, 195-96 (Okla. Crim. App. 2007). There was no objection to this testimony at trial, and Petitioner's trial was not rendered fundamentally unfair by its admission.

Interpreting Oklahoma law, the OCCA reviewed Petitioner's claims presented in Ground III of this habeas petition and found no error. A federal court is bound by a state court's interpretation of its own state laws. *Parker v. Scott*, 394 F.3d 1302, 1311 (10th Cir. 2005); *Hawkins v. Mullin*, 291 F.3d 658, 662-63 (10th Cir. 2002). Because the OCCA's determination of this claim was not contrary to, or an unreasonable application of, Supreme Court law, *see* 28 U.S.C. § 2254(d)(1), this habeas claim must fail.

**Ground IV: Autopsy Photographs**

Petitioner complains in Ground IV that the trial court improperly allowed the admission of three autopsy photographs of Andrea's skull to show the nature and extent of the fatal skull fracture inflicted on the infant. Petitioner complains the photographs were gory and prejudicial. The respondent maintains the photographs were proper to show the nature and extent of the baby's fatal injuries, and Petitioner was not denied a fundamentally fair trial.

The OCCA reviewed this claim on direct appeal and found no error in the introduction of the autopsy photographs at trial:

> The State introduced three autopsy photographs at trial which showed Andrea's scalp peeled back to reveal the extensive skull fracture which caused her death. . . . Appellant argues that the photographs were unduly gruesome and served only to incite feelings of horror, sympathy and revenge. She

16

complains that the photos were not admissible as their probative value was substantially outweighed by the danger of unfair prejudice. 12 O.S. 2001, § 2403. Although defense counsel filed a pretrial motion requesting that these photos be excluded, this motion was denied and counsel did not renew his objection to the photographs when the State sought to introduce them at trial. As counsel lodged no timely objection at trial, we review for plain error only. *Williams v. State*, 188 P.3d 208, 223 (Okla. Crim. App. 2008).

The admission of photographs is within the trial court's discretion and will not be disturbed absent an abuse of discretion. *Browning v. State*, 134 P.3d 816, 837 (Okla. Crim. App. 2006). This Court has held that photographs may be relevant to show the nature and location of wounds, corroborate the medical examiner's testimony, or show the crime scene. *Id*. Autopsy photographs in particular may be relevant to support the testimony of the medical examiner and aid the jury in understanding the nature of the wounds suffered by the deceased. *Mitchell v. State*, 235 P.3d 640, 655 (Okla. Crim. App. 2010). While the autopsy photographs introduced in the present case were indeed graphic and gruesome, they were also relevant to support the medical examiner's testimony by showing the nature and extent of the fatal injuries suffered by Andrea. The photographs were relevant and their probative value was not substantially outweighed by the danger of unfair prejudice. We find no abuse of discretion in the trial court's decision to admit the photographs. Appellant was not deprived of her constitutional rights by the admission of these photographs.

*Barry*, No. F-2009-1120, slip op. at 15-16.

The admission of photographs is an issue of state law, and "[f]ederal habeas review is not available to correct state law evidentiary errors . . . ." *Wilson v. Sirmons*, 536 F.3d 1064, 1114 (10th Cir. 2008) (citations omitted). The Supreme Court has held that a habeas petitioner is only entitled to relief under the due process clause when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

Here, the OCCA examined the admissibility of this evidence state law and found no error. This court finds the OCCA's determination was not contrary to, or an unreasonable

application of, relevant of Supreme Court law, and it did not deprive Petitioner of a fundamentally fair trial. This claim is meritless.

**Ground V:  Ineffective Assistance of Trial Counsel**

Petitioner alleges in Ground V that she was denied effective assistance of trial counsel, because he failed to object to the autopsy photos at issue in Ground IV. She also argues that trial counsel was ineffective in abandoning the defense theory that her son A.H. killed the baby and in failing to hire an expert and present evidence to support that theory.

The OCCA reviewed these claims and in its detailed and thorough opinion found that trial counsel was not ineffective:

> . . . Appellant alleges that failings of defense counsel deprived her of her Sixth Amendment right to the effective assistance of counsel. This Court reviews claims of ineffective assistance of counsel under the two-part *Strickland test* that requires an appellant to show:  (1) that counsel's performance was constitutionally deficient; and (2) that counsel's performance prejudiced the defense, depriving the appellant of a fair trial with a reliable result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Davis v. State*, 123 P.3d 243, 246 (Okla. Crim. App. 2005).  It is not enough to show that counsel's failure had some conceivable effect on the outcome of the proceeding.  Rather, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.  *Head v. State*, 146 P.3d 1141, 1148 (Okla. Crim. App. 2006).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

> In support of her claim, Appellant first cites to trial counsel's failure to object to the admission of the autopsy photographs, to the trial testimony and argument regarding Appellant's drug use and lack of remorse and emotion, and to the opinion evidence of John Hobbs and Dr. Chandler.  As noted [in the above discussion], there was no error in the admission of most of this evidence.  Defense counsel cannot be deemed to have rendered ineffective assistance for failing to object to admissible evidence.  Although defense counsel did not object to each instance where Appellant's drug use was mentioned, he did object to some and this objection was sustained, curing the

error. The instances where improper evidence was not met with objection did not render Appellant's trial fundamentally unfair and Appellant has not shown a reasonable probability that, but for counsel's alleged unprofessional error, the result of the proceedings would have been different.

Appellant next complains that defense counsel was ineffective for failing to present a critical, viable defense theory with available evidence. She specifically complains that counsel was ineffective for abandoning the defense that five-year-old A.H. had caused the fatal injuries to Andrea in favor of the defense that Robert Heath killed the child. Additionally, Appellant claims that counsel was ineffective for failing to hire an expert to rebut the medical examiner's opinion regarding the force required to cause the skull injury that killed Andrea and to present evidence of A.H.'s aggressive and violent history to show that he was physically and mentally capable of causing the fatal injury.

When Appellant was interviewed by John Hobbs, she told him that although she did not know what had happened to Andrea, she thought that A.H. hit her on the head with a board because she woke to find A.H. standing in the hallway next to Andrea and there was a board lying on the floor next to her. This was the theory of defense proffered at Appellant's earlier trials and Appellant claims that it should have been pursued again in her third trial. In support of this argument, Appellant notes that her first trial ended in a mistrial and her second trial was reversed and remanded in part because trial counsel failed to offer evidence rebutting the State's expert testimony that A.H. was not physically capable of inflicting the fatal injuries upon Andrea. She argues on appeal that in light of the serious problems with offering the defense that Robert Heath was the actual killer, trial counsel was ineffective for abandoning the defense that A.H. was the one who killed Andrea.

. . . Defense counsel in the present case took great care to avoid . . . pitfalls [from the previous two trials] by filing and arguing a motion in limine to exclude evidence of Appellant's drug use prior to the killing, the condition of Appellant's home, and testimony regarding Appellant's parenting abilities and her lack of emotion with regard to her children. This motion was granted as to prior drug use offered merely to show that Appellant was a drug user, the condition of her home, and her general lack of parenting skills. It was, however, noted by the trial court at the hearing on the motion in limine that evidence deemed inadmissible based on the motion in limine could become relevant at trial and be ruled admissible at that time. Defense counsel acknowledged and agreed that evidence of Appellant's drug usage and lack of

parenting skills could become admissible if the defense opened the door to the admission of this evidence.

When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland*, 466 U.S. at 689. We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that, under the circumstances, the challenged action might be considered sound trial strategy. *Id*. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690). Courts have consistently emphasized that counsel is to be given broad latitude with regard to his or her choice of trial strategy. . . . Furthermore, it is not the role of this Court to second-guess counsel's strategic choices. *See Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

Although Appellant argues that defense counsel should have presented both defenses as they were not inconsistent, it appears that counsel made a strategic choice to abandon the position that A.H. had killed Andrea as the presentation of this defense would likely have opened the door to evidence damaging to Appellant that counsel had successfully precluded in his motion in limine. This decision falls squarely within the type of strategic decision to which we give strong deference and we cannot find that it was, under the circumstances of this case, unreasonable. Having determined that defense counsel's decision not to pursue the defense that A.H. killed Andrea was reasonable trial strategy under the circumstances, it was also reasonable for defense counsel not to hire experts or put on evidence in support of this abandoned defense. Appellant has failed to show that counsel's performance was constitutionally deficient and that counsel's performance prejudiced the defense, depriving her of a fair trial with a reasonable result. *Strickland*, 466 U.S. at 687 (1984); *Davis*, 123 P.3d at 246. Appellant was not denied her constitutional right to the effective assistance of counsel. . . .

*Barry*, slip op. at 17-21 (footnote omitted).

In conjunction with her claim of ineffective assistance of counsel, Petitioner asked the OCCA for an evidentiary hearing concerning her claim that trial counsel was ineffective in failing to use available evidence and to adequately investigate and identify additional

evidence that could have been utilized at trial. *Id*. at 21 (citation omitted). She specifically asserted that "defense counsel was ineffective for failing to investigate and present the testimony of a forensic pathologist to rebut the State's expert evidence about the force used to inflict the fatal injuries that resulted in Andrea's death." *Id*. at 22. In addition, Petitioner claimed counsel was ineffective in "failing to present available evidence, much of which was part of the record from [her] first two trials, indicating that A.H. was a violent and disturbed child." *Id*.

The OCCA thoroughly reviewed the application for an evidentiary hearing, attached affidavits, and other non-record evidence and noted that "several of the exhibits attached to [the] application contain exactly the type of evidence defense counsel painstakingly sought to keep the State from introducing at trial." *Id*. (footnote omitted). "Additionally, the interviews and evaluations of A.H. purporting to show that he demonstrated aggressive behavior were conducted after Andrea was killed and were not necessarily indicative of his behavior before the homicide." *Id*. The OCCA denied the application for an evidentiary hearing, finding that Petitioner "failed to show with clear and convincing evidence a strong possibility that counsel was ineffective for failing to identify or use the evidence raised in the motion." *Id*. at 23.

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is 'doubly' so. . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted).

This court finds the record in this case clearly establishes that trial counsel's

performance satisfied the requirements of *Strickland v. Washington*. The court further finds the determination of this claim by the OCCA was not contrary to, or an unreasonable application of, clearly established Supreme Court law. Ground V of the petition fails.

**Ground VI: Cumulative Error**

Finally, Petitioner alleges that the alleged accumulation of error in her trial deprived her of a fair trial. The OCCA found that "although her trial was not error-free, any error and irregularities, even when considered in the aggregate, do not require relief because they did not render her trial fundamentally unfair, taint the jury's verdict, or render sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively." *Barry*, slip op. at 23-24.

"Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) *cert. denied*, 522 U.S. 844 (1997)). *See also Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002), *cert. denied*, 540 U.S. 833 (2003) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated.").

As discussed above, there is no basis for habeas corpus relief for Grounds I-V of the petition. Therefore, there is no cumulative error. The OCCA's determination of this claim was consistent with federal law, and Ground VI of the petition fails.

**Certificate of Appealability**

The court further finds Petitioner has failed to make a "substantial showing of the

denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, she has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability cannot be issued.

**ACCORDINGLY**, Petitioner's petition for a writ of habeas corpus (Dkt. 1) is DENIED, and this action is, in all respects, dismissed. Petitioner also is denied a certificate of appealability.

**IT IS SO ORDERED** this 15th day of March 2016.

**Dated this 15th day of March, 2016.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma